IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | | |
|---|---|---|---|
| TONYA RANEE SCATES, | ) | | |
| | ) | | |
| Plaintiff, | ) | Case No. 5:15-cv-00032 | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| SHENANDOAH MEMORIAL | ) | By: | Michael F. Urbanski |
| HOSPITAL, | ) | | United States District Judge |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION

In this case, Tonya Ranee Scates ("Scates") claims her former employer, Shenandoah Memorial Hospital ("SMH"), terminated her employment in retaliation for her complaints about false billing practices for ultrasound exams. Before the court is SMH's motion for summary judgment, ECF No. 52. SMH also brings a motion in limine, ECF No. 48, and a motion to exclude certain plaintiff's witnesses, ECF No. 50. Scates brings motions in limine as well. ECF Nos. 70, 71. The matter has been fully briefed, and the court heard oral argument on September 21, 2016. For the reasons set forth below, the court finds that Scates has failed to establish a genuine issue of material fact, and SMH is entitled to judgment as a matter of law. Accordingly, the court will **GRANT** SMH's motion for summary judgment (ECF No. 52). The parties' remaining motions (ECF Nos. 48, 50, 70, 71) are **DENIED as moot.**

I.

Defendant SMH is a medical facility that offers medical imaging and other services. ECF No. 26, ¶ 4. SMH is a member of a network of hospitals known as Valley Health. Id. Plaintiff Tonya Scates worked as an ultrasound technician and radiologic technologist at SMH from February 2014 until January 27, 2015. Id. ¶¶ 7, 42, 44. Her duties included performing ultrasound exams. In October 2014, Scates attended an ultrasound seminar, during which she overheard the instructor discussing billing procedures for ultrasounds, including the Current Procedural Terminology ("CPT") billing codes promulgated by the American Medical Association. Id. ¶ 21. Based on this information, Scates believed that ultrasounds performed at SMH failed to meet CPT billing standards, because technicians at SMH took fewer ultrasound photos than required. Id. ¶ 25. "Scates feared that SMH would face charges of fraud" for this failure to meet CPT billing requirements. Id. ¶ 27.

Upon returning from the seminar, Scates claims she reported her billing concerns to her supervisor, James Ziner ("Ziner"). Id. ¶ 28. Ziner is the Radiology Director at SMH. Id. ¶ 9. Scates allegedly told Ziner that "[f]raud cases are on the rise," and asked him to clarify CPT billing requirements. Id. ¶ 28, 29. Ziner told Scates that he would look into it. Id. ¶ 31. Scates also discussed her concerns with Gayle Wellard, who allegedly agreed with Scates that SMH failed to meet CPT billing requirements. Id. ¶ 33. Scates and Wellard then spoke to Ziner together; Ziner did not respond to their concerns. Id. ¶ 34.

During roughly the same period, Scates was involved in several workplace disputes,[1]

---

[1] SMH management fielded complaints about Scates from coworkers, Campisi Dep. Tr. 29:9–15, 38:20–39:11, 59:1–20; 59:1–8; Heishman Dep. Tr. 31:21–32:1, 37:21, workers outside the imaging department, id. at 25:19–20, 26:20–21, 27:5–6, a patient, id. 39:13–20, an instructor, id. at 63:8–17, and a student at SMH, id. at 99:8–19. Scates, for her part, frequently complained of being treated poorly by her coworkers, Campisi Dep. Tr. 118:15–18; Heishman Dep. Tr.

2

most notably with her coworker, Laurice Corbitt ("Corbitt"). See ECF No. 26, ¶¶ 14–20, 38, 40–41. Corbitt complained that Scates "would not give her information that would be helpful to patient care," and that she would "tattle to Jim [Ziner]" about Corbitt's behavior. Heishman Dep. Tr. 94:13–16. Scates, in turn, reported Corbitt for serious errors in her work several times, including in October 2014. ECF No. 26, ¶¶ 19, 20.

On November 6, 2014, Scates met with Ziner, SMH Vice President Lisa Stokes, and SMH Human Resources Officer Debbie Campisi. Id. ¶ 36. Ziner and Stokes gave Scates a "corrective action document" outlining several complaints filed by coworkers against Scates. Id. Scates claims that Ziner recognized that these complaints were false. Id. ¶ 37. Corbitt never received a corrective action document. Campisi Dep. Tr. 22:6–11. In December 2014, Ziner requested that Corbitt and Scates meet to resolve the issues between them; Corbitt refused. ECF No. 26, ¶ 40.

Scates filed another complaint against Corbitt in January 2015. Id. ¶ 41. On January 27, 2015, Scates met with Ziner and Stokes. Id. ¶ 42. During this meeting, Ziner said he was "tired of dealing" with Scates's workplace conflicts. Id.; see Ziner Dep. Tr. 100:1–22. Ziner and Stokes terminated Scates and prohibited her from working at any hospital within the Valley Health network. ECF No. 26, ¶¶ 44, 45.

Scates brought this suit in May 2015, alleging a claim for retaliation under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), and a state-law wrongful termination claim. ECF No. 1. SMH filed a motion to dismiss the original complaint, ECF No. 4, which was denied as moot after Scates moved to amend her original complaint. ECF Nos. 13, 14. Scates then

---

72:12–14; Reynard Dep. Tr. 14:6–10. In short, the record reveals "a lot of drama," that seemed to originate "right after [Scates] was hired." Campisi Dep. Tr. 35:14–20.

3

filed her amended complaint, ECF No. 15, and SMH again moved to dismiss. ECF No. 16.

On October 19, 2015, the court granted SMH's motion to dismiss, finding Scates "failed to allege sufficient facts to state a prima facie case for retaliation" under the FCA, and that her claims under Virginia law were implausible. ECF No. 24, at 1. The court dismissed with prejudice Scates's claims under Virginia law, but granted her leave to file a second amended complaint, asserting "additional allegations against SMH on her FCA retaliation claim only." Id. at 19. Scates did so, ECF No. 26, and SMH filed a motion for summary judgment on July 25, 2016. ECF No. 52.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the

4

specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

5

## III.

The whistleblower provision of the FCA prohibits retaliation against employees because of "lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). To establish retaliation, a plaintiff must show (1) she engaged in "protected activity," (2) her employer knew about that activity; and (3) her employer took action against her as a result. Glynn v. EDO Corp., 710 F.3d 209, 214 (4th Cir. 2013).

SMH argues it is entitled to summary judgment on all three of these requirements: Scates's "vague concern about billing was not 'protected activity' under the FCA, was not sufficient to put SMH on notice of any such activity, and was not the reason for her termination." ECF No. 53, at 2. The court agrees that Scates has failed to show that a reasonable jury could find for her on elements (1) that she engaged in protected activity; and (3) that SMH fired her as a result of this activity. Because all three elements are necessary to establish a retaliation claim, and either finding is sufficient to compel the grant of summary judgment to SMH, the court will not reach element (2): the issue of whether SMH was on notice of Scates's activity.

### A. Protected Activity

Congress amended § 3730(h) in 2010 by adding "efforts to stop 1 or more violations" of the FCA as protected activity under the statute. Thus, employee action is protected if it is taken (1) "in furtherance of an action" under the FCA, or represents (2) "other efforts to stop 1 or more" FCA violations. 31 U.S.C. § 3730(h). Proof that the FCA has been violated is not necessary to establish protected activity. Graham Cty. Soil & Water Conservation Dist.

6

v. United States ex rel. Wilson, 545 U.S. 409, 416 n.1 (2005). In fact, in some circumstances, § 3730(h) "protects an employee's conduct even if the target of an investigation or action to be filed [is] innocent." Id. at 416.

Activity is protected under the first prong if it meets the "distinct possibility" standard. Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 344 (4th Cir. 2010); Layman v. MET Labs, Inc., No. RDB-12-2860, 2013 WL 2237689, at *7 (D. Md. May 20, 2013). "Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" Mann, 630 F.3d at 338 (ellipsis in original) (quoting Eberhardt v. Integrated Design & Const., Inc., 167 F.3d 861, 869 (4th Cir. 1999)).

The second prong ("other efforts to stop" FCA violations) protects a wider range of activity. Carlson v. DynCorp Int'l LLC, No. 14-1281, 2016 WL 4434415, at *3 (4th Cir. Aug. 22, 2016) (unpublished); see Smith v. Clark/Smoot/Russell, 796 F.3d 424, 434 (4th Cir. 2015) (second prong "plainly encompasses more than just activities undertaken in furtherance of a False Claims Act lawsuit"). In Carlson, the plaintiff argued he was retaliated against for his efforts to stop an FCA violation by his employer. 2016 WL 4434415, at *1. The court "assume[d], without deciding," that "efforts to stop 1 or more violations" are "protected activity where those efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA."[2] Id. at *4.

---

[2] This "objectively reasonable standard" was applied by other circuits to the pre-amendment version of § 3730(h). Id. (citing cases from the Sixth, Seventh, Eighth, and Ninth Circuits). Moreover, the "objectively reasonable" standard "does not substantially depart" from the "distinct possibility" standard: a distinct possibility of litigation "requires that protected activity relate to company conduct that involves an objectively reasonable possibility of an FCA

7

SMH argues Scates cannot prevail under either prong because her belief that SMH engaged in fraud was objectively unreasonable. See ECF No. 53, at 21; ECF No. 75, at 6. Because Scates's first concern was related to SMH's potential underbilling (which cannot be considered fraudulent), and her second concern merely reflects her own misunderstanding of how to bill for certain ultrasounds, SMH concludes that neither concern raises an objectively reasonable possibility of fraud, and "therefore, Scates did not engage in 'protected activity' by raising her concerns." ECF No. 53, at 21 (quoting Mann, 630 F.3d at 345–47). The court agrees.

Scates broadly describes her concerns as related to "inconsistencies in descriptions of services provided by ultrasound technicians." ECF No. 67, at 5. These inconsistencies fall into three categories. First, Scates was concerned about ultrasound technicians' failure to consistently document the use of a transvaginal probe.[3] See Scates Dep. Tr. 155:14–19, 162:8–163:25, 205:18–206:14. Sometimes an order for an "ultrasound complete" would include use of a transvaginal probe, despite the fact that "ultrasound complete with transvaginal" was often separately requested. Id. at 155:12–19. Scates's second concern is similar: she claims technicians often used a technique known as duplex Dopplar[4] when it was not requested, despite the fact that other orders specifically called for it. Id. at 206:21–207:8. Finally, Scates was concerned that technicians were taking fewer images than necessary during obstetrics ultrasounds. Id. at 191:24–192:4.

---

action." Id. at *4 n.* (internal quotation marks omitted) (quoting Mann, 630 F.3d at 338). Thus both standards are closely related: a plaintiff who acts on an objectively unreasonable basis will not be protected by the FCA.

[3] Also known as an intravaginal transducer, a transvaginal probe is used to image organs within the pelvic cavity. See Wellard Dep. Tr. 82:22–24.

[4] Duplex Dopplar is used to check that the ovaries are receiving blood flow, to rule out torsion. Id. at 206:15–18.

8

### 1. Transvaginal Probe and Duplex Dopplar

Scates's first two concerns are insufficient to establish an objectively reasonable belief that SMH violated the FCA. The inconsistencies in billing for transvaginal probes and duplex Dopplar both imply, at worst, *under*billing, not overbilling. Scates's deposition reflects this fact:

> Q . . . Is the transvaginal an add on, an additional procedure?
>
> A Yes.
>
> Q Was your concern that SMH was failing to accurately reflect when that additional procedure was performed?
>
> A Correct.
>
> Q So if a patient received two procedures but only one was recorded, they have kind of gotten one for free; right?
>
> A We are not accurately documenting what the patient received.
>
> . . .
>
> Q And is [duplex Doppler] an additional procedure, an add on?
>
> A Yes.
>
> Q And was your concern that techs were performing that add on but not accurately documenting that they had done the additional procedure?
>
> A Correct.
>
> . . .
>
> Q And by using the Doppler to your knowledge should there have been an additional charge for the procedure?

9

> A  To my knowledge, I believe so, but I asked for clarification.

Id. at 205:18–209:25. To be sure, Scates's account, taken as true, represents an inconsistency in billing procedures. This inconsistency, however, could not violate the FCA, because it would result in discrepancies in the government's favor. See United States ex rel. Rector v. Bon Secours Richmond Health Corp., No. 3:11-CV-38, 2014 WL 1493568, at *13 (E.D. Va. Apr. 14, 2014) (plaintiff's allegation of "shoddy or suspicious business practices" insufficient to constitute protected activity under § 3730(h)).

The Fourth Circuit's recent decision in Carlson involved similar facts. The plaintiff alleged his employer, a government contractor, was underreporting its indirect costs to the government. 2016 WL 443415, at *1. The court held this allegation failed to state a theory of fraud on the government. Id. at *5. The FCA "was intended to reach all types of fraud . . . that might result in *financial loss* to the Government." Id. (ellipsis in original) (internal quotation marks omitted) (quoting United States v. Neifert-White Co., 390 U.S. 228, 232 (1968)). Carlson, like Scates, failed to "point[] to any FCA provision or case that would make under billing a violation." Id. This failure rendered Carlson's case implausible.

The court is compelled to reach the same conclusion here. "Without fraud, there can be no FCA action." Mann, 630 F.3d at 345–46. For a misrepresentation to be fraudulent, it must "induce another to act *to his or her detriment.*" Carlson, 2016 WL 4434415, at *6 (quoting Black's Law Dictionary (10th ed. 2014)). If SMH made misrepresentations in its billing for transvaginal probes and duplex Dopplar, it only shortchanged itself, to the benefit, not detriment, of the government. As a result Scates has failed to show that her concerns about transvaginal probes and duplex Dopplar were objectively reasonable.

10

## 2. Obstetrics Ultrasounds

In her complaint, Scates claims that she was concerned "that technicians at SMH were taking fewer ultrasound photos than the standard practice to meet the billing criteria." ECF No. 26, ¶ 25. Scates bases this concern on a conversation she claims she overheard at an ultrasound seminar. In that conversation, the instructor said that, "in standard practice," CPT billing criteria were not being met in obstetric ultrasounds.[5] Scates Dep. Tr. 191:24–192:9. Scates knew little else that would arouse suspicion: she admits she is unfamiliar with billing criteria or the standard practice in question. Id. at 192:15–193:4. She never received a CPT code book, id. at 230:5–6, and disclaims any knowledge of how SMH submits and monitors ultrasound billing. See id. at 224:4–18. This ignorance weighs against her. See Glynn v. Impact Sci. & Tech., Inc., 807 F. Supp. 2d 391, 410 (D. Md. 2011) (employee that was unaware of contract requirements could not have objectively reasonable belief that employer falsified compliance with those requirements (citing Mann, 630 F.3d at 345)); Green v. St. Louis, 507 F.3d 662, 667 (8th Cir. 2007) (affirming dismissal where plaintiff admitted in deposition that he was unaware of fraudulent application or report to the government).

Moreover, Scates is unforthcoming on how SMH's obstetrics ultrasounds failed to live up to billing standards. The court can find only one specific allegation of deficiency. Scates claims that obstetrics ultrasounds failed to document placental location, though she seems unsure if that failure amounts to a billing deficiency.[6] Scates Dep. Tr. 201:11–15 ("Q:

---

[5] This comment appears to be directed at the state of obstetric ultrasounds in general; Scates does not allege the instructor was commenting on SMH practices particularly.

[6] Gayle Wellard, Scates's coworker, claims that Scates told her pelvic ultrasounds, rather than obstetric ultrasounds, failed to conform to billing criteria. Wellard Dep. Tr. 85:23–25. However, in her deposition Scates only calls

11

What were you not imaging that you were supposed to image? A: Well, I never got that answer. From my understanding, it was placental location . . . ."); id. at 214:13–15, 313:2–4 ("If I remember at Winchester, I think they looked at the placenta that [sic] we didn't do at Shenandoah."). Her concerns about institutional failure to document placental location are contradicted by the worksheet Scates and other SMH employees used to perform obstetric ultrasounds, which specifically includes a blank to document placental location. ECF No. 75-14, at 6 (Exhibit C1). This suggests confusion on the part of Scates or other ultrasound technologists, not a systematic decision by SMH to underperform obstetric ultrasounds.

Neither can Scates's coworkers, Gayle Wellard and Gina Reynard, salvage her claim. Scates claims Wellard confirmed "based on what Scates told her, SMH may not be in compliance with regulations . . . ." ECF No. 67, at 5. Critically, this confirmation was based solely on Scates's subjective fears. These fears were conveyed to Wellard in vague terms, which mentioned neither coding nor billing. Wellard Dep. Tr. at 83:3–84:4 ("She was simply concerned [that] . . . we weren't doing a complete enough exam for specific levels.") Wellard did not investigate SMH's billing compliance herself, and appears to have simply taken Scates's claims at face value. Id. at 97:25–98:25. Wellard's agreement with Scates's theory simply reflects the scant information Scates already had—it adds nothing new to the court's analysis. See Lang v. Nw. Univ., 472 F.3d 493, 494 (7th Cir. 2006) (holding that a claim of fraud "based on nothing other than office gossip" was not objectively reasonable). An objectively unreasonable belief shared by two people is still unreasonable.

Reynard, meanwhile, claimed in her declaration that she "observed that some

---

attention to obstetric ultrasounds.

12

technologists sometimes billed patients for Computer Tomography Angiography contrasts or reconstructions that had not been done." Reynard Decl. ¶ 6. This independent, unsupported allegation does not tip the scales in Scates's favor; an objectively reasonable observer could not see Reynard's claims as proof that Scates's unrelated claims have objective merit. Cf. Lang, 472 F.3d at 495 (Section 3730(h) does not protect "tall tales as well as legitimate investigations."). Otherwise, multiple unreasonable complaints could gain protection under § 3730(h) merely by force of repetition.

Admittedly, an employee need not "have gathered all of the evidence by the time of the [claimed] retaliation." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998). The information the employee has gathered, however, must be sufficient to create an objectively reasonable belief in an FCA violation. See Glynn v. EDO Corp., 710 F.3d 209, 216 (4th Cir. 2013) ("'[C]onclusory allegations and speculative assertions . . . without further legitimate support clearly does not suffice' to create a genuine issue of material fact." (ellipsis in original) (quoting Guinness PLC v. Ward, 955 F.2d 875, 901 (4th Cir. 1992))). Scates overhead a general conversation and applied it to her employer with no objectively reasonable cause to do so. The FCA does not protect so meritless an investigation.

The court holds Scates's belief that SMH violated the FCA is objectively unreasonable. This alone is sufficient to grant summary judgment in SMH's favor. Nonetheless, the court will also consider whether—assuming her course of conduct amounts to "protected activity" under § 3730(h)—Scates has shown that a reasonable jury could find that she was fired because of this conduct.

13

## B. Causation

Section 3730(h)(1) entitles an employee to relief when that employee is discharged "because of" acts protected by the FCA. The parties disagree on what causation standard this language imposes. Scates relies on Huang v. University of Virginia, and contends she only need demonstrate her protected activity was one motivating factor in SMH's decision. 896 F. Supp. 2d 524, 552 (W.D. Va. 2012). SMH argues Huang was overruled by University of Texas Southwestern Medical Center v. Nassar, which imposes a "but-for" causation standard.[7] 133 S. Ct. 2517, 2528 (2013); accord Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) (imposing "but for" causation standard based on Age Discrimination in Employment Act language that prohibited firing "because of" age).

The court need not resolve this question. Even assuming Scates is correct, SMH is still entitled to put forward evidence of a non-retaliatory motive, which Scates must then rebut. See Huang, 896 F. Supp. 2d at 552 (citing Glynn v. Impact Sci. & Tech., Inc., 807 F. Supp. 2d 391, 416 (D. Md. 2011)).

> Many courts analyze the issue of retaliation and pretext in FCA cases in the context similar to the McDonnell Douglas test, which states that once a plaintiff establishes a prima facie case of discrimination, the burden of production, not persuasion, shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.[8]

---

[7] The Court in Nassar considered a Title VII retaliation claim, and did not apply its holding to the FCA. Id. at 2522. However, Title VII, like the FCA, imposes liability when the decision to fire was made "because of" protected conduct, which SMH argues makes Nassar controlling.

[8] "The Fourth Circuit has not yet decided whether [the] McDonnell Douglas Corp. burden-shifting analysis applies to whistleblower claims under the FCA, although other Circuits have." Wilson v. Raytheon Tech. Servs. Co., No. 1:12-cv-1437, 2014 WL 12520031, at *4 n.9 (E.D. Va. Aug. 14, 2014) (citing Scott v. Metro Health Corp., 234 Fed. App'x 341, 346 (6th Cir. 2007)). This court uses the McDonnell Douglas framework, as the court in Wilson did, because it is widely endorsed by other circuits, see, e.g., Diaz v. Kaplan Higher Educ., L.L.C., 820 F.3d 172, 175 (5th Cir. 2016); United States ex rel. Schweizer v. Oce N.V., 677 F.3d 1228, 1240–41 (D.C. Cir. 2012); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25 (1st Cir. 2012); Scott v. Metro Health Corp., 234 Fed. App'x 341, 346 (6th Cir. 2007), and because "the McDonnell Douglas approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)." Harrington, 668 F.3d at 30.

14

Dillon v. SAIC, Inc., No.1-12-cv-390, 2013 WL 324062, at *9 (E.D. Va. Jan. 28, 2013) (citations omitted). "Once a legitimate reason [for termination] is articulated, the burden then shifts back to 'the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action.'" Elkharwily v. Mayo Holding Co., 823 F.3d 462, 470 (8th Cir. 2016) (quoting Pedersen v. Bio–Med. Applications of Minn., 775 F.3d 1049, 1054 (8th Cir. 2015)).

### 1. Legitimate Reasons for Termination

Scates maintains she was terminated in response to an October 2014 meeting, in which she allegedly told Ziner that she was concerned SMH was violating the FCA. ECF No. 67, at 9. Scates was ultimately fired in January 2015. Id. at 10. This "close temporal proximity," Scates argues, supports a strong inference of causation. Id. at 9; see Coursey v. Univ. of Md. E. Shore, 577 Fed. App'x 167, 175 (The "discharge of an employee soon after [s]he engages in a protected activity is 'strongly suggestive of retaliatory motive.'" (quoting Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994))).

Assuming Scates makes out a prima facie case of retaliation, see id. (holding temporal proximity can "give[] rise to a sufficient inference of causation to satisfy the prima facie requirement" (internal quotation marks omitted) (quoting King v. Rumsfeld, 328 F.3d 450, 460 (4th Cir. 1994))), the burden shifts to SMH. SMH responds by presenting evidence of a non-retaliatory reason for firing Scates: her poor relationships with coworkers. Scates has a history of workplace conflict that consumed her supervisors' time and ultimately "risked compromising patient care." ECF No. 75, at 13. Scates was told that her behavior needed to be improved "many months" before she raised the issue of fraud. ECF No. 53, at 24–25.

15

Moreover, Scates was given a chance to improve: she was placed on a ninety-day performance improvement plan ("PIP"). ECF No. 75, at 16. During her PIP, Scates failed to improve, remained uncommunicative with coworkers and students, and even deliberately chose not to change her behavior. Id.; see Scates Dep. Tr. 273:25–274:10. Only then was she terminated. ECF No. 75, at 16.

Given this asserted reason for termination, the burden shifts back to Scates to show pretext. Scates brings three arguments. First, she cites the deposition testimony of coworkers to argue that "the facts show that the alleged 'difficulty in collaboration' came largely as a result of the bullying of Scates by coworkers. ECF No. 67, at 11. In her telling, Scates did not foment discord, but had it imposed on her by coworkers who "gang[ed] up" on her and launched "a conspiracy," which included complaints about Scates's "hair color, the shoes she wore to work, and accusations she did not clean the office coffee pot." Id. Second, Scates claims she was treated differently from other, similarly situated coworkers: though her supervisors knew that she was being "bullied" by coworkers, they chose to terminate Scates, not the coworkers. Id. at 13. Third, Scates argues that she was uncommunicative *because of*, not despite, her PIP. She claims that Ziner told her, while on the PIP, she could not ask for nor provide help to coworkers. Id. at 12.

Scates misunderstands what is required to show an articulated reason for termination is pretextual. The record is replete with evidence that Scates violated SMH's written Standards of Behavior and her PIP, and that her supervisors were aware of these violations. E.g., Heishman Dep. Tr. 77:6–13, 99:8–19, 100:14–15, 103:10–16; Ziner Dep. Tr. 63:19–64:17; see ECF No. 75-3, at 48–53 (notes from meetings in which Scates's performance

16

issues were discussed). To rebut this showing, Scates cannot merely argue her supervisors made a bad decision, were incorrect about her performance, or the workplace discord was actually the fault of another; she must put forward evidence that the reasons SMH offered were not truly in contemplation, and that she was truly fired for engaging in protected action. See DeJarnette v. Corning Inc., 133 F.3d 293, 298 (4th Cir. 1998) ("When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (internal quotation marks omitted) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 107 F.3d 406, 410–11 (7th Cir. 1997))); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (same).

Scates argues she was a good worker who was bullied and "ganged up on." See ECF No. 67, at 11–13. This disputes SMH's decision, and argues that it was incorrectly made. However, it does nothing to show that SMH's proffered reason for termination was pretextual. Evans v. Techs. Apps. & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996) ("self-assessment of the plaintiff" irrelevant to retaliation analysis). Scates shows she considered herself a good worker, but does nothing to rebut the fact that her supervisors disagreed. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007) (The court should focus on the "perception of the decisionmaker" when assessing pretext. (quoting Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444 (4th Cir. 1998))); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993) (in a racial discrimination case, plaintiff failed to show pretextual termination where he proved "the existence of a crusade to terminate him" that was personally, rather than racially, motivated).

17

Scates's second argument fails for a similar reason. Scates claims that similarly situated workers who did not investigate fraud were not terminated, while she was. These similarly situated workers she cites are in fact the very employees who allegedly bullied Scates. ECF No. 67, at 13. These employees are not reliable comparators because they were Scates's antagonists in the very workplace feud that SMH puts forward as justification for its decision to terminate Scates. Scates and these coworkers are not "similar in all relevant aspects" besides her engagement in protected conduct. Haywood v. Locke, 387 Fed. App'x 355, 359 (4th Cir. 2010). To the contrary, these coworkers filed complaints against Scates of "horizontal violence,"[9] and she reciprocated. Ziner Dep. Tr. 63:19–64:5; Heishman Dep. Tr. 100:14–15. To resolve this interpersonal issue, SMH necessarily had to make a credibility determination, and credit Scates's account or those of the various coworkers with whom she fought.[10] The fact that these employees were not terminated, and Scates was, merely reflects the fact that SMH, rightly or wrongly, believed Scates, not her coworkers, to be the "common denominator in creating a negative environment" in the workplace. ECF No. 67-12 (Scates's "Valley Health Corrective Action Form").

Scates's third argument—that she was unhelpful to coworkers because Ziner told her to not help coworkers or ask them for help—is simply implausible. Scates's account is contradicted by the Performance Improvement Plan itself: Because Scates had "[d]ifficulty

---

[9] The record reveals at least seven people complained to SMH about Scates's behavior: coworkers, other employees, an instructor, a patient, and a nurse. See Campisi Dep. Tr. 29:9–15, 38:20–39:11, 59:1–20; 59:1–8 (Sabine Jankiewicz, Kristen Dean); Corbitt Dep. Tr. 55:5–21 (Laurice Corbitt); Heishman Dep. Tr. 16:16–19; 25:19–20, 26:20–21, 27:5–6, 31:21–32:1, 63:8–17, 99:8–19, 100:14–15, (Jennifer Wiatrowski, Patti Hershey, Haylie Darr, Kim Shrum). Scates has pointed to no other employee who kept her job despite being complained about so frequently by so many people.

[10] Campisi found Scates's account suspect: she felt that Scates frequently complained just prior to another employee lodging a complaint about Scates, in order to "weaken the state of what was going to happen next." Campisi Dep. Tr. 118:15–22.

18

collaborating with co-workers," the PIP required she "[e]xert even collaboration with all peers in order to get the same in return." ECF No. 75-9 (Exhibit 2: "Valley Health Performance Improvement Form"). SMH hospital culture encouraged friendliness and cooperation. Campisi Dep. Tr. 60:7–13 ("If you've ever been in our hospital, every single person in there says, Hi, how are you? . . . It was part of our culture."); id. at 72:7–9 ("[I]t's common practice that you always help one another.") In her deposition, Scates herself recognizes that she was not allowed to be unhelpful. Scates Dep. Tr. 295:9–15. Most importantly, this argument fails as a matter of common sense. Scates says that she ignored a student and was unhelpful to coworkers because Ziner required it. ECF No. 67, at 12. It is simply implausible to suggest, in response to complaints of workplace friction (caused in part by Scates's refusal to speak to certain coworkers) Scates's supervisor would place her on a "performance improvement plan" that forbade basic politeness.[11]

## IV.

The court finds that SMH is entitled to summary judgment for two reasons. First, Scates has failed to put forward evidence that would enable a reasonable jury to conclude that her belief that SMH was violating the FCA was objectively reasonable. Second, Scates failed to rebut SMH's proffered non-retaliatory reason for her termination. Because either of these reasons alone is sufficient to entitle SMH to summary judgment, the court need not address whether SMH was on notice of Scates's FCA investigation.

The court concludes that Scates's retaliation claim under the FCA fails as a matter of

---

[11] In his deposition, Ziner describes a meeting in which he told Scates to "not try to help and . . . focus on your job responsibilities," in response to coworkers' complaints that Scates was being "dominant" and "bossy." Ziner Dep. Tr. 67:1–20. If Scates interpreted this instruction as a strict prohibition on helpfulness or even conversation, she did so unreasonably, and cannot use her interpretation to show pretext.

19

law. SMH's motion for summary judgment (ECF No. 52) is **GRANTED**. The parties' remaining motions (motions in limine and motions to exclude certain witnesses, ECF Nos. 48, 50, 70, 71) are **DENIED as moot**.

An appropriate Order will be entered.

Entered: 10/26/2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge